## UNITED STATES v. SANTINI.

(Circuit Court of Appeals, Second Circuit. May 12, 1920.)

No. 211.

**Customs duties ⬤⟶129—Evidence to establish fraudulent introduction of merchandise.**

In an action by the United States against an importer, under Tariff Act Oct. 3, 1913, § III, par. H (Comp. St. § 5526), to recover the value of merchandise alleged to have been introduced by means of fraudulent invoices, it is not essential that plaintiff prove the actual market value of the merchandise, and the introduction in evidence of original invoices, showing that defendant paid more than the price given in the invoices on which it was entered, is sufficient to require submission of the case to the jury.

In Error to the District Court of the United States for the Southern District of New York.

Action by the United States against Hubert Santini. Judgment for defendant, and the United States brings error. Reversed.

Francis G. Caffey, U. S. Atty., of New York City (Harold Harper, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Carl E. Whitney, of New York City, for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The plaintiff in error sued under paragraph H, § III, of the Tariff Act of October 3, 1913 (Comp. St. § 5526), to recover $13,482.83. This is the value of the merchandise that had gone into consumption, which merchandise, it is claimed by the government, was entered and introduced into the commerce of the United States by the defendant in error and his partner, who do business under the name of the Italian Bedspread Company, by means of fraudulent written entries and invoices. There are 18 importations of merchandise, imported at various times between September 21, 1915,

and July 13, 1916. These are enumerated in the complaint filed. At the close of the government's case, the claim was reduced to $37,070.92 by reason of the withdrawal of one of the claims and failure of proof as to some of the others. The proof at the trial tended to establish that the Italian Bedspread Company, with the knowledge of the defendant in error, paid more money for merchandise which was imported from Italy than was set forth in the entry and invoices presented to the collector. It was proved that different invoices, stating a price higher than the price set forth in the papers filed with the collector, were delivered to the defendant in error by the shipper. By this, and through two letters which were offered in evidence, the government contends that it established an intent to defraud the government of revenue. The letters are as follows:

"In view of the present circumstances they (the Tessitura di Brembate) cannot continue to sell at the prices established before the war. We succeeded in getting the September shipment at the same prices, but the October shipment, which will be the next will be advanced 5 per cent.; the shipment for November and after, they don't know at this time if they can manufacture them, it depending upon the price they will be able to make. We tried, regarding the future shipments, to get the advance in prices limited to a maximum of 5 per cent., but failed, as you will note from their letter. Therefore we must take up each shipment separately. As you are the sole receivers of Fedra and given the limited production, the promise made you, the advance you will easily make up by the good prices you will get in your market, and then you know all contract prices are being advanced, so that the decision of the Brembate Company must not surprise you. Summing up, save cable instructions to the contrary, we will continue to ship the Fedra at the prices we are able to obtain, certainly the lowest prices possible. The consular invoice, save advices to the contrary, we will compile always at the contract prices and for the advance we will compile a supplemental invoice which will not figure in the invoice; it will be a debt apart, so that you will continue to pay the same customs duties and at least in that you will not be sacrificed. As the Brembate Company compiled the September consular invoice, an unusual procedure, we thought that they had received your instructions. We asked them and they answered, no. We let that consular invoice stand, being already made out, and so as not to entangle your matters unduly. After this we will always compile the invoices. These friends communicated your letter to us, which remains unanswered with the others inclosed."

And the reply:

"Brembate. If the Brembate Company, cannot do without it, we accept the 5 per cent. advance for next year, but we do not want to climb any higher for fear of breaking our neck. The 5 per cent. means already an advance of L. O. 75 per quilt, and should suffice. That's right about the consular invoices. Respect the contract always, because we want to avoid annoyances."

Paragraph H of section III of the Tariff Act (Comp. St. § 5526) provides:

"That if any consignor, seller, owner, importer, consignee, agent, or other person or persons, shall enter or introduce, or attempt to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall make any false statement in the declarations provided for in paragraph F without reasonable cause to believe the truth of such statement, or shall aid or procure the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, or shall be guilty of any willful act or omission by means whereof the United States shall or may be deprived

of the lawful duties or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or persons shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates. That the arrival within the territorial limits of the United States of any merchandise consigned for sale and remaining the property of the shipper or consignor, and the acceptance of a false or fraudulent invoice thereof by the consignee or the agent of the consignor, or the existence of any other facts constituting an attempted fraud, shall be deemed, for the purposes of this paragraph, to be an attempt to enter such merchandise notwithstanding no actual entry has been made or offered."

There are now 16 importations concerning which proof was offered at the trial. It is the claim of the government that as to each of these 16 importations, the evidence required the trial judge to submit the evidence to the jury as a question of fact for them to determine whether or not there were fraudulent written entries or invoices made out and an undervaluation, thus cheating the government of its lawful revenue. The District Judge dismissed the action for failure of proof as to true market value, holding as a matter of law that the proof as to what was paid, standing by itself, is insufficient to show market value.

The Tariff Act expressly requires that the invoice, stating the time when, the place where, the person from whom, the same is purchased, or agreed to be purchased, and the actual cost thereof, or the price agreed upon, fixed, or determined, shall be given in the case of purchased goods. It is obvious that this requirement is to place before the appraiser the actual paid or agreed price, and that for the purpose of appraisal. No other statement of market value is required. The appraiser is not bound or limited by the price paid or agreed to be paid in his examination. Under the act it is apparent that he may make inquiry as to what is in fact the true market value, and to this end he may examine as to market values by certificates or affidavits of persons engaged in the particular trade to which the merchandise belongs. Ordinarily, if truthful, the statement as to actual price paid is the basis for fixing the market value. It has long been established that proof of sales of merchandise is admissible in determining the market value. In re Bloch, 109 Fed. 790, 48 C. C. A. 650; Ommen v. Talcott (D. C.) 175 Fed. 261; Matter of Johnston, 144 N. Y. 563, 39 N. E. 643; Parmenter v. Fitzpatrick, 135 N. Y. 190, 31 N. E. 1032. This is so for the reason that the price agreed upon by the parties to the sale ought to be some evidence of the value of property which has changed hands in a transaction executed in good faith.

The Tariff Act, paragraph I, permits the importation, upon setting forth the price paid for goods, to make "such deduction from the cost or value given in the invoice or pro forma invoice or statement in form of an invoice, which he shall produce with his entry, as in his opinion may raise or lower the same to the actual market value or wholesale price of such merchandise." This permits acceptance, if the price paid is not the actual market value. The failure to set forth any acceptance, and to use the figures given upon each of the entries

here in question, is an admission or statement that the price as paid was the true market value, and this was for the jury's consideration. While it was permissible for the government to prove the foreign market value where the goods were purchased, still we think that was not essential to the establishment of the government's prima facie case. It was sufficient for the government to establish that the false statement in the invoice tended to deprive the United States of revenue. United States v. 99 Diamonds, 139 Fed. 961, 72 C. C. A. 9, 2 L. R. A. (N. S.) 185. If the jury was satisfied that the purchase price of the importations in question was greater than the sums made as entries when the importation took place, the jury could find fraud in making such written entries and invoices. Without rehearsing the testimony as to each of the 16 importations concerning which proof was adduced, it is sufficient to say in each instance the government established the importation on each particular date, the entry and invoice presented to the collector stating the name of the seller and the price actually paid for said merchandise. The proof further established payments made by the Italian Bedspread Company for merchandise which is sufficiently identified to justify a jury question of its connections with the particular shipment, indicating that the price paid to the seller was greater than the value given in the invoice, and in each transaction there was some loss of revenue to the government. This, taken in connection with the letters which were exchanged between the house of Galimberti & Co., of Genoa, who acted as the assemblers and bankers of the Italian Bedspread Company, and the defendant in error, would indicate a fraudulent purpose and intent to defraud the government.

Paragraph T, § III, of the Tariff Act (Comp. St. § 5791), provides as follows:

"T. That in all suits or informations brought, where any seizure has been made pursuant to any act providing for or regulating the collection of duties on imports or tonnage, if the property is claimed by any person, the burden of proof shall lie upon such claimant, and in all actions or proceedings for the recovery of the value of merchandise imported contrary to any act providing for or regulating the collection of duties on imports or tonnage, the burden of proof shall be upon the defendant: Provided, that probable cause is shown for such prosecution, to be judged of by the court."

Whether probable cause was shown for the prosecution under this section is to be judged by the court. Probable cause as used means less than evidence which would justify a conviction, and in the case of seizure, circumstances which warrant suspicion. We think the facts here present reasonable ground for suspicion. In each case submitted, the amount paid exceeded the consular invoice. In these instances, the defendant in error knowingly received private bills showing a higher price paid for the merchandise and, in one instance, the defendant in error not only received a bill, but forged it to explain the increase to the general appraiser. The letters above quoted support suspicion upon reasonable grounds.

We think the evidence here required the questions of fact to be submitted to the jury.

Judgment reversed.